UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

PATRICK NELSON,

     Plaintiff,

  -- against --.

LIGANDAL, INC., LIGANDAL TECHNOLOGY, LLC,
ANDRE WATSON, ALEXANDER HONKALA, and
EDWIN UREY,

     Defendants.

14-cv-02617 (RRM) (VVP)

**DEFENDANTS LIGANDAL
TECHNOLOGY, LLC, ANDRE
WATSON, AND ALEXANDER
HONKALA'S ANSWER,
AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS**

Defendants and Counter-claimants Ligandal Technology, LLC ("Ligandal
Tech",) Andre Watson ("Watson"), and Alexander Honkala ("Honkala") (collectively
"Defendants"), by and through their undersigned counsel of record, Law Offices of
Anthony Pastor, P.C., respectfully submit their Answer, Affirmative Defenses, and
Counterclaims as follows:

## <u>ANSWER TO COMPLAINT</u>

  1.  Defendants admit, upon information and belief, that Plaintiff Patrick
Nelson currently resides at 2 St. John's Place, Stillwater, NY 12170.  Defendants deny
the remaining allegations in Paragraph 1 of the Complaint

  2.  Defendants admit the allegations in Paragraph 2 of the Complaint.

  3.  Defendants admit the allegations in Paragraph 3 of the Complaint.

4.     Defendants admit, upon information and belief, the allegations in Paragraph 4 of the Complaint.

5.     Defendants admit, upon information and belief, the allegations in Paragraph 5 of the Complaint.

6.     Defendants admit the allegations in Paragraph 6 of the Complaint.

## JURISDICTION AND VENUE

7.     Defendants admit that Plaintiff resides in a different state than Ligandal, Inc. ("Ligandal"), Ligandal Technology, LLC ("Ligandal Tech."), Urey, Watson, and Honkala.  Defendants deny the remaining allegations in Paragraph 7 of the Complaint because the amount in controversy (exclusive of interest and costs) does not exceed the sum of $75,000.

8.     Defendants admit, upon information and belief, that Plaintiff currently resides in the State of New York.  Defendants lack knowledge or information sufficient to form a belief of what Plaintiff refers to as "many of the misrepresentations made by Defendants," and deny the remaining allegations in Paragraph 8 of the Complaint.

## FACTUAL BACKGROUND

9.     Defendants admit, upon information and belief, that Plaintiff enrolled in St. John's University School of Law in or about the fall of 2012.  Defendants deny the remaining allegations in Paragraph 9 of the Complaint.

10.     Defendants deny the allegations in Paragraph 10 of the Complaint.

11.     Defendants deny the allegations in Paragraph 11 of the Complaint.

12.     Upon information and belief, Defendants admit that Plaintiff enrolled in a summer study-abroad program through St. John's University School of Law, and studied in Rome, Italy during the summer of 2013.  Defendants deny the allegation that "Plaintiff took time to continue to diligently work on the project." Defendants lack knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 12 of the Complaint.

13.     Defendants deny the allegations in Paragraph 13 of the Complaint.

14.     Defendants deny the allegations in Paragraph 15 of the Complaint.

15.     Defendants deny the allegations in Paragraph 15 of the Complaint.

16.     Defendants admit that Urey began to assist Watson and Honkala with business plans for their proposed company.  Defendants deny all remaining allegations in Paragraph 16 of the Complaint.

17.     Defendants admit that, in or about the first week of August 2013, Urey and Plaintiff hosted at their apartment Watson and Honkala and that Urey, Watson and Honkala worked diligently on a presentation for a pitch competition, for which they were awarded second place.  Defendants deny the remaining allegations in Paragraph 17 of the Complaint.

18.     Defendants admit that Plaintiff took a leave of absence from St. John's University School of Law. Defendants deny the remaining allegations in Paragraph 18 of the Complaint.

19.     Defendants deny the allegations in Paragraph 19 of the Complaint.

20.     Defendants admit the August 7th Operational Agreement stated that Watson was the Chief Science Officer, Honkala was the Chief Technology Officer,

Plaintiff was the Chief Operations Officer, and the Urey was the Strategic Director. Defendants also admit that Plaintiff drafted that August 7th Operational Agreement. Defendants deny the remaining allegations in Paragraph 20 of the Complaint..

21.     Defendants deny the allegations in Paragraph 21 of the Complaint.

22.     Defendants admit the allegations in Paragraph 22 of the Complaint.

23.     Defendants admit that in August 2013, Ligandal Tech. received its first investment from a personal contact of Urey's and that the amount of this investment was $20,000 on a convertible note.  Defendants admit that Plaintiff drafted a poorly written convertible note.  Defendants deny the remaining allegations in Paragraph 23 of the Complaint.

24.     Upon information and belief, Defendants deny the allegations in Paragraph 24 of the Complaint.

25.     Defendants admit that Plaintiff's title was changed to Corporate Development Director.  Defendants deny the allegations in Paragraph 25 of the Complaint.

26.     Defendants admit that the Plaintiff, Watson, Honkala, and Urey each signed a lease for a home office beginning in December 2013.  Defendants deny the remaining allegations in Paragraph 26 of the Complaint.

27.     Defendants admit that in December 2013, Ligandal Tech. received a second investment in the form of a $24,000 warrant, and that Plaintiff drafted the warrant.  Defendants deny the remaining the allegations in Paragraph 27 of the Complaint.

28.     Defendants admit that Plaintiff flew from California to New York. Defendants deny the remaining allegations in Paragraph 28 of the Complaint.

29.     Defendants admit that Urey, Watson, and Honkala spoke on the phone with an attorney from the firm of Fenwick & West LLP, and discussed forming a new company – Ligandal, Inc. – in the State of Delaware.  Defendants deny the remaining allegations in Paragraph 29 of the Complaint.

30.     Defendants admit that on or about January 1, 2014, Plaintiff returned to California from New York.  Defendants also admit that Plaintiff, Urey, Watson, and Honkala had a meeting with Michael T. Esquivel, a partner at Fenwick & West LLP, to discuss the steps necessary to incorporate a new company in Delaware. Defendants also admit that Plaintiff was never a director, shareholder, or officer of Ligandal, Inc.  Defendants deny the remaining allegations in Paragraph 30 of the Complaint.

### Count I
**(Fraud in the Inducement)**

31.     Defendants repeat their responses to Paragraphs 1 through 30 of the Complaint as if each of those responses was set forth fully and at length herein.

32.     Defendants deny the allegations in Paragraph 32 of the Complaint.

33.     Defendants deny the allegations in Paragraph 33 of the Complaint.

34.     Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     Defendants deny the allegations in Paragraph 35 of the Complaint.

36.     Defendants deny the allegations, if any, in Paragraph 36 of the Complaint.

## Count II
## (Breach of Fiduciary Duty)

37.     Defendants repeat their responses to Paragraphs 1 through 36 of the Complaint as if each of those responses was set forth fully and at length herein.

38.     Defendants deny the allegations in Paragraph 38 of the Complaint.

39.     Defendants admit that Watson and Honkala owe Ligandal, Inc. a fiduciary duty to act in good faith in furtherance of the best interests of Ligandal, Inc. To the extent that Paragraph 39 of the Complaint contains any other allegations, Ligandal Tech. lacks knowledge or information sufficient to form a belief about those allegations.

40.     Defendants deny the allegations in Paragraph 40 of the Complaint.

41.     Defendants deny the allegations in Paragraph 41 of the Complaint.

42.     Defendants deny the allegations in Paragraph 42 of the Complaint.

43.     Defendants deny the allegations, if any, in Paragraph 43 of the Complaint.

## Count III
## (Breach of Contract)

44.     Defendants repeat their responses to Paragraphs 1 through 43 of the Complaint as if each of those responses was set forth fully and at length herein.

45.     Defendants admit that on August 7, 2013, the Ligandal Tech. Operational Agreement was executed.  Defendants deny the remaining allegations in Paragraph 45 of the Complaint.

46.     Defendants deny the allegations contained in Paragraph 46 of the Complaint.

47.     Defendants deny the allegations contained in Paragraph 47 of the Complaint.

48.     Defendants deny the allegations, if any, in Paragraph 48 of the Complaint.

## Count IV
### (Tortious Interference)

49.     Defendants repeat their responses to Paragraphs 1 through 48 of the Complaint as if each of those responses was set forth fully and at length herein.

50.     Defendants admit that on August 7, 2013, the Ligandal Tech. Operational Agreement was executed.  Defendants deny the remaining allegations in Paragraph 50 of the Complaint.

51.     Defendants deny the allegations in Paragraph 51 of the Complaint.

52.     Defendants deny the allegations in Paragraph 52 of the Complaint.

53.     Defendants deny the allegations contained in Paragraph 53 of the Complaint.

54.     Defendants deny the allegations, if any, in Paragraph 54 of the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE
**(Failure to State a Claim – Claims I-IV)**

55.     Against Claims I-IV, and each allegation therein, Defendants assert that Plaintiff fails to state a claim against any of the Defendants upon which relief can be granted.

### SECOND DEFENSE
**(Failure to Allege Fraud with Particularity – Claim I)**

56.     Against Claim I, and each allegation of fraud and misrepresentation therein, Defendants assert that Plaintiff fails to aver with particularity the actions of Defendants that constituted fraud in accordance with Federal Rule of Civil Procedure 9(b).

### THIRD DEFENSE
**(Unjust Enrichment – Claims I-IV)**

57.     Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff seeks to recover more than he is entitled to recover, and any award resulting from those Claims would thereby unjustly enrich Plaintiff.

### FOURTH DEFENSE
**(Lack of Consideration – Claims I-IV)**

58.     Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff failed to and / or was unable to provide the services that he was to provide in order to qualify for equity in Ligandal Tech.

### FIFTH DEFENSE
**(Equitable Estoppel – Claims I-IV)**

59.     Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff made false representations that were relied on to the detriment

of Defendants, and that Plaintiff is estopped by his conduct from recovering on the asserted Claims.

## SIXTH DEFENSE
### (Anticipatory Repudiation – Claims I-IV)

60.    Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff refused to perform the services that he now asserts form the basis of his Claims.

## SEVENTH DEFENSE
### (Cancelation of Contract – Claims I-IV)

61.    Against Claims I-IV, and each allegation contained therein, Defendants assert that any contract that Plaintiff now contends forms the basis of his Claims was mutually cancelled by Plaintiff, Urey, Watson, and Honkala.

## EIGHTH DEFENSE
### (Fraud, Deceit, or Misrepresentation by Plaintiff – Claims I-IV)

62.    Against Claims I-IV, and each allegation contained therein, Defendants assert that any contract that was allegedly entered between Plaintiff on one side and Watson and Honkala on the other was obtained through Plaintiff's fraud, deceit, or misrepresentation, and as a result any such contract is invalid and / or unenforceable.

## NINTH DEFENSE
### (Failure of Condition Precedent– Claims I-IV)

63.    Against Claims I-IV, and each allegation contained therein, Defendants assert that Watson and Honkala's performance under any alleged contract entered between Plaintiff on one side and Watson and Honkala on the other was conditioned on Plaintiff's performance, which did not occur.

## TENTH DEFENSE
### (Unclean Hands – Claims I-IV)

64.     Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff is barred from benefiting from his wrongdoings.

## ELEVENTH DEFENSE
### (Waiver – Claims I-IV)

65.     Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff, through his representations, acts and/or omissions, has waived his right to sue.

## TWELFTH DEFENSE
### (Not Proximate Cause – Claims I-IV)

66.     Against Claims I-IV, and each allegation contained therein, Defendants assert that even assuming wrongdoing by Defendants, which Defendants expressly deny, such wrongdoing was not the proximate cause of Plaintiff's alleged injuries; Plaintiff's alleged injuries resulted from prior, intervening, and/or subsequent conditions, causes, or occurrences attributable to Plaintiff or third parties over whom Defendants exercised no control, and for whom Defendants are not responsible.

## THIRTEENTH DEFENSE
### (Bad Faith – Claims I-IV)

67.     Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff's claims are frivolous, brought in bad faith, and/or are brought for an improper purpose.

**FOURTEENTH DEFENSE**
**(Legitimate Business Purpose – Claims I-IV)**

68.     Against Claims I-IV, and each allegation contained therein, Defendants assert that each and every one of Defendants' allegedly improper actions was taken for a legitimate business purpose and/or amount to an appropriate exercise of supervisory authority.

**FIFTEENTH DEFENSE**
**(Business Torts Duplicative– Claims II & IV)**

69.     Against Claims II & IV, and each allegation contained therein, Defendants assert that those claims are duplicative of Plaintiff's Claim III for breach of contract.

**SIXTEENTH DEFENSE**
**(Lack of Subject Matter Jurisdiction – Claims I-IV)**

70.     Against Claims I-IV, and each allegation contained therein, Defendants assert that the Court does not have subject matter jurisdiction over Plaintiff's asserted Claims.

**SEVENTEENTH DEFENSE**
**(No Entitlement to Attorneys' Fees – Claims I-IV)**

71.     Against Claims I-IV, and each allegation contained therein, Defendants assert that Plaintiff fails to allege a cause of action demonstrating entitlement to attorneys' fees, and/or such relief is not permitted by law.

**DEFENDANTS' COUNTERCLAIMS**

72.     Defendants repeat their responses to Paragraphs 1 through 71 of the Complaint as if each of those responses was set forth fully and at length herein.

**JURISDICTION AND VENUE**

73.      Jurisdiction is proper under 28 U.S.C. § 1332 (diversity) because

Plaintiff resides in a different state from the Defendants and the amount in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

74.      Venue is proper in this district under 28 U.S.C. § 1391(b) & (c).


**FACTUAL BACKGROUND RELATED TO COUNTERCLAIMS**

75.      From February 2011 until April 2013, Watson created and developed

a novel nanoparticle delivery system in which the nanoparticles localize to a

subcellular compartment where they perform what is effectively genomic surgery

on DNA of the cell.

76.      During that period, Watson studied biomedical engineering at

Rensselaer Polytechnic Institute ("RPI").  Watson discovered the potential of the

field of therapeutic nanotechnology and began synthesizing gene-delivering

nanoparticles. Watson's research and development at RPI led to him submitting an

invention disclosure to RPI, which, under information and belief, has filed a

provisional patent application based on Watson's invention.

77.      In April 2013, Watson and Honkala jointly prepared a draft document

called "Strategization" plan for a yet-to-be formed company called "Ligandal

Nanotech."  This "Strategization" document stated that the future company's goal

was to "conglomerate the currently disparate research in the fields of biological

science, pharmacology, nanotechnology, and others by introducing powerful

scientific management and design tools."

78.     In April 2013, Watson asked about 10 of his friends to review, if they had

time, his "Strategization" document.  Plaintiff was one of the people that Watson had

asked. Shortly thereafter, Plaintiff replied to Watson, attaching a copy of the

"Strategization" document containing minor, non-substantive edits.  Plaintiff's edits

consisted of (1) adding a photo of and a short biography of himself (in which he refers to

himself as an "iconoclast biochemist turning attorney [who focuses] on understanding the

intersection of science, business, and law [and who] will be instrumental to networking,

partnerships, and business development efforts of [Ligandal Nanotech]" and (2) a two-

paragraph section titled "Positioning" that merely repeated regurgitated the information

that Watson and Honkala had written in their original draft of the "Strategization"

document.  Plaintiff also attempted to add his name to the copyright in the footnote of the

document.

79.     Upon information and belief, Plaintiff does not have a law degree. Upon

information and belief, Plaintiff has never been licensed, in any state, to practice law.

80.     After reviewing Watson & Honkala's "Strategization" document, Plaintiff

asked Watson if he could become part of the yet-to-be-formed company.  Plaintiff

claimed that he had expertise in modeling cash flows and complex market strategy.

Plaintiff claimed that he could also prepare income statements and balance sheets.

Moreover, Plaintiff also claimed that he was an expert in contract law, and that he could

prepare contracts and corporate filings on behalf of Watson and Honkala's proposed

company.

81.    Because of Plaintiff's representations that he could provide legal advice, Watson agreed to consider Plaintiff's request to become part of the company that Watson and Honkala were creating.

82.    During the months of May-July 2013, Plaintiff continued his efforts to convince Watson that Plaintiff could provide legal advice "as acting legal counsel" and could also oversee the business development of Watson and Honkala's proposed company.  Aside from these representations and requests, however, Plaintiff performed no work on behalf of the Defendants during this period of time.

83.    In reliance on the Plaintiff's representations, Watson and Honkala asked Plaintiff to form their proposed company as a Delaware C-corporation. Plaintiff refused, stating that, in his opinion, a Nevada LLC would be easier and would provide them all of the benefits of a Delaware C-corporation.  Plaintiff affirmatively represented that, if Watson and Honkala formed their company as an LLC, it would be possible for company officers to receive equity until the company went public.

84.    Watson and Honkala then questioned Plaintiff's suggestion, stating that it was important to them that the company be able to compensate its future officers by providing equity through vesting schedules.  Plaintiff responded to their inquiry by stating that "they didn't go to law school" and thus wouldn't understand that a Nevada LLC would provide them the structure they needed, as well as additional benefits.

85.    In reliance on the Plaintiff's representations of legal expertise on this issue, Watson and Honkala followed Plaintiff's legal advice on the formation of their

14

proposed company as a Nevada-based LLC.  Plaintiff then prepared a draft

document titled "Ligandal Technology Operational Agreement."

86.     Based on Plaintiff's representations of legal expertise, Watson and

Honkala asked Plaintiff about how a Nevada LLC would be able to make its officers

eligible for equity in compensation for work performed on the company's behalf.

Plaintiff insisted that his proposed "Operational Agreement" could contain an

"ownership distribution" listing each officer's eligibility for equity distributions.

87.     Watson and Honkala relied on Plaintiff's legal advice and

representations about how to structure Ligandal Tech.'s future equity distributions,

and followed Plaintiff's suggested "ownership distribution" suggestion.  Over

Plaintiff's objections, Watson and Honkala insisted that the Operational Agreement

also include a listing of the duties and responsibilities that the listed officers would

need to perform in order to qualify for future equity distributions.

88.     During the first week of August 2013, Plaintiff introduced Watson and

Honkala to Urey, who was at that time Plaintiff's roommate.  Urey began to help

Watson and Honkala develop a plan to develop customers and investors.

89.     On August 7, 2013, Plaintiff, Watson, Honkala, and Urey each signed

the "Ligandal Technology Operational Agreement" (the "Aug. 7th Agreement").  The

Aug. 7th Agreement, prepared by Plaintiff, included the above-mentioned

"ownership distribution" list.  The August 7th Agreement also identified the officers

of Ligandal Tech and the work that they promised to perform in order to be eligible

for the equity outlined in the "ownership distribution."

90.     In reliance on Plaintiff's repeated representations that he would be able to handle all of the company's legal needs and handle all aspects of the company's business development, Watson and Honkala hired Plaintiff to be the "Chief Operating Officer" of Ligandal Tech.

91.     The Aug. 7th Agreement identifies Plaintiff as such, and also states his duties and responsibilities as the Chief Operations Officer.  Plaintiff's duties included "[e]nsuring the productive progression of the day-to-day operations," "interfacing between all technical developments, legal, and financial issues," [d]irecting customer development and outreach," and "[s]eeking out and forming fruitful partnerships with related companies."

92.     In exchange for performing these duties, the "ownership distribution" in the Aug. 7th Agreement stated that Plaintiff would be eligible for a 28.2% equity share of Ligandal Tech.

93.     Plaintiff's first responsibility as Ligandal Tech.'s Chief Operating Officer was to register and file the required forms to establish the company as a Nevada-based LLC.  Despite Plaintiff's multiple representations that he had the expertise to do so, he did not.  In fact, it took Plaintiff about 4 weeks to figure out how to get it done.

94.     In late August 2013, Plaintiff told Watson that he didn't work for him. Upon information and belief, in August - September 2013, Plaintiff had sought out employment opportunities and went on job interviews.

95.     When Watson, Honkala, and Urey (the "Ligandal Tech. Officers") asked about the delay in the formation of the Nevada LLC, Plaintiff was evasive,

stating, "he was trying to integrate innovation into the bylaws." Upon information and belief, Plaintiff eventually resorted to paying an on-line legal service to create the company's required formation documents.

96.    After the Aug. 7th Agreement was signed, the Ligandal Tech. Officers began speaking with a number of potential investors.   Most of the people they spoke with advised them that it would be better for the company to be formed as a Delaware C-corporation, rather than a Nevada-based LLC.  Most of the venture capitalists stated that they would not consider investing in a start-up that wasn't a Delaware C-corporation.

97.    Later in August 2013, because Plaintiff still hadn't formed the Nevada LLC, the Ligandal Tech. Officers again asked him to form a Delaware C-corporation. Plaintiff refused, and in September 2013, formed Ligandal Tech. as a Nevada LLC. Plaintiff did so despite the Ligandal Tech. Officers' stated preference to establish the company as a Delaware-based C-corporation.

98.    In September 2013, Plaintiff's next assignment was to prepare a break-even analysis for Ligandal Tech.  Plaintiff refused and / or was unable to prepare one.

99.    Also in September 2013, Plaintiff was asked to draft End-User License Agreements ("EULAs") for Ligandal Tech.  Plaintiff was again evasive as to when he would prepare them, and instead responded that he was "digging through securities law" instead – even though not relevant to his preparation of the EULAs.  Plaintiff never provided the requested EULAs.

100.     Also in the beginning of September 2013, the Ligandal Tech. Officers held a board meeting to discuss Plaintiff's inability to complete the few tasks that he had been assigned by that point (like form the company).  The Ligandal Tech. Officers also discussed Plaintiffs' inability to get along with potential investors or the Ligandal Tech. Officers.  At this meeting, the Ligandal Tech. Officers and Plaintiff jointly agreed that Plaintiff would be demoted from Chief Operations Officer to Corporate Development Director, that his business development responsibilities would be reduced, and that his eligibility for future distribution of Ligandal Tech. equity would be reduced to 15%.  At this board meeting, Plaintiff acknowledged the damage his shortcomings and intransience had caused to Ligandal Tech. and to the Ligandal Tech. Officers.

101.     Plaintiffs was still, however, responsible for all of Ligandal Tech.'s legal needs, and Ligandal Tech. and the Ligandal Tech. Officers continued to rely on his continued representations that he was qualified to provide such legal services.

102.     Plaintiff did not record the mutual agreement concerning Plaintiff's reduced responsibilities and the reduction in the amount of Ligandal Tech. equity for which Plaintiff would be eligible.  Ligandal Tech. and the Ligandal Tech Officers relied on Plaintiff's decision to not record their agreement in writing.

103.     Also in September 2013, Plaintiff was again asked to form a Delaware C-corporation.  Plaintiff said that he would look into the steps required and would get back to the Ligandal Tech. Officers.  Plaintiff did not provide any information on this subject in September 2013.

104.    In October 2013, Plaintiff was asked to prepare a consulting agreement.  After several weeks, Plaintiff provided a draft consulting agreement that was riddled with typographical and other errors, and which did not contain any provisions directed to basic issues like jurisdiction and severability.  This consulting agreement draft was the amount of work product that Plaintiff was able to achieve in October 2013.

105.    Because of the poor quality of Plaintiff's draft consulting agreement, Ligandal Tech. was unable to use it.  Ligandal Tech has since had to pay an outside attorney to prepare one.

106.    Also in October 2013, Plaintiff was again asked to form a Delaware C-corporation.  Plaintiff was initially hostile to this repeated request, but later agreed to look into the steps required and stated that he would get back to the Ligandal Tech. Officers.  Plaintiff, however, never provided such information .

107.    In November 2013, Plaintiff was asked to prepare a detailed summary of the approval process for the United State Federal Drug Administration ("FDA").  Plaintiff was given two weeks in which to prepare this summary.  Plaintiff refused / was unable to do so.  Around December 24, 2013 – over 5 weeks later – Plaintiff submitted a 2-page document on the FDA approval process that was unusable.

108.    Also in November 2013, Plaintiff was again asked to form a Delaware C-corporation.  Plaintiff did not provide any information on this subject in November 2013.

109.    Also in November 2013, the Ligandal Tech. Officers secured a December 2, 2013 meeting with an angel investment group that had expressed

interest in investing in Ligandal Tech. Plaintiff insisted on making the presentation himself. As a result, Plaintiff was asked to prepare the presentation materials for the December 2nd meeting and to distribute them about a week beforehand. Again, Plaintiff failed to achieve this task, and instead submitted an incomplete draft just hours before the meeting was scheduled to begin.

110. When the Ligandal Tech. Officers questioned Plaintiff about the poor quality of the presentation materials, Plaintiff became hostile. He responded that the presentation materials were inconsequential and that he would make up for it with his "showmanship."

111. Plaintiff's performance at the December 2nd meeting was a complete embarrassment, leading to an abrupt end in Ligandal Tech.'s communications with that angel investment fund.

112. Also in December 2013, Plaintiff was again asked to form a Delaware C-corporation. At this time, Plaintiff finally admitted that he did not know how and would be unable to form one. Shortly thereafter, Plaintiff and the Ligandal Tech. Officers jointly agreed that it would be necessary to hire outside counsel.

113. On or about January 6, 2013, upon information and belief, Urey and Honkala had a phone call with an attorney from Fenwick & West. Upon information and belief, the purpose of the call was to set up a face-to-face meeting about getting assistance with forming the Delaware C-corporation that Plaintiff was unable to form.

114. On or about January 14, 2014 Plaintiff and the Ligandal Tech. Officers met with the Fenwick & West attorney. At this time, Plaintiff and the Ligandal Tech.

Officers all agreed to retain Fenwick & West as outside counsel for the purpose of creating the Delaware C-corporation that Plaintiff was unable to form.

115.    While walking out of the January 14th meeting, Plaintiff expressed surprise at how easy the formation of a Delaware C-corporation actually was.

116.    At this point, it was objectively clear to all that Plaintiff had severely misrepresented his legal and business expertise and had failed to provide the services he promised in the Aug. 7th Agreement.  Plaintiff's misrepresentations caused Ligandal Tech. to miss several business opportunities.  Moreover, Ligandal Tech. now had to pay outside counsel to re-do many of the documents that Plaintiff had been asked to prepare.

117.    In the beginning of February 2014, the Ligandal Tech. Officers and Plaintiff had a board meeting for the purpose of removing Plaintiff as an officer of Ligandal Tech. and removing his eligibility for future distributions of equity.  At this meeting, Plaintiff agreed with his removal as an officer and with his removal from eligibility for future equity distributions – but requested that he be allowed to resign in order to save his reputation.  The Ligandal Tech. Officers agreed.  Moreover, despite the damage caused to the company by relying on Plaintiff's multiple misrepresentations, the Ligandal Tech. Officers, in good faith, offered Plaintiff an "Advisory Board" position and eligibility for 1% of Ligandal Tech.'s equity.  Plaintiff verbally agreed to this offer.  Before the Ligandal Tech Officers sent Plaintiff a written draft of this agreement, Plaintiff filed this litigation.

118.    On February 24, 2014, Ligandal was registered in Delaware as a C-corporation.  Thereafter, Ligandal assumed Ligandal Tech.'s debt, in exchange for

Ligandal Tech.'s confidential information, documents, and other intellectual property.

119.    After Plaintiff's removal from Ligandal Tech., Plaintiff returned to New York.  Upon information and belief, Plaintiff made copies of Ligandal Tech's (now Ligandal's) confidential information without the prior knowledge or consent of the Ligandal Tech. Officers, Ligandal, or Ligandal Tech.  Upon information and belief, this information had, until Plaintiff's actions, been kept in Ligandal Tech.'s private files and databases.  Upon information and belief, Plaintiff then formed a company with the purpose of commercialization of that confidential information.

120.    Upon information and belief, Plaintiff, without authorization or consent, made copies of Ligandal Tech.'s (now Ligandal's) confidential business development and investor lists.  Upon information and belief, after February 2014, Plaintiff began contacting third-parties identified on those confidential documents, with the intent of inducing those third-parties to invest in his new company – instead of Ligandal Tech. or Ligandal – using Ligandal Tech.'s (now Ligandal's) confidential business model.

121.    Upon information and belief, after February 2014, Plaintiff contacted RPI and attempted to procure a license to the technology that Watson invented.  Upon information and belief, Plaintiff also sought to prevent Ligandal Tech., Ligandal, and the Ligandal Tech. Officers from receiving a similar license.  Upon information and belief, Plaintiff has also contacted and / or attempted to hire graduate students from RPI, in the hopes that they could replicate the technology created by Watson.

122.     Upon information and belief, Plaintiff has distributed – without authorization – Ligandal Tech.'s (now Ligandal's) confidential information to third parties.

**FIRST COUNTERCLAIM**
**(Fraud in the Inducement)**

123.     Defendants repeat and reallege Paragraphs 72 through 122 of the Counterclaims as if each of those paragraphs was set fully and at length herein.

124.     In about April 2013, after being shown the "Strategization" document prepared by Watson and Honkala, Plaintiff made gross misrepresentations to Watson and Honkala about Plaintiff's legal and business expertise.  Plaintiff falsely represented that he was an expert in contract law, in developing complex market strategies, and in modeling cash flows.  Plaintiff also falsely stated that he could prepare the corporate financial documents, business contracts, and corporate filings.

125.     Plaintiff's misrepresentation about his skills and expertise were made intentionally in order to gain financially from of the nearly 2 years of hard work by Watson and Honkala.

126.     In reliance on Plaintiff's representations that he would be able to handle all of the legal and business development issues for their proposed company and thus would not have to rely on or hire outside counsel,  Watson and Honkala made Plaintiff the Ligandal Tech.'s Chief Operations Officer.  In further reliance on Plaintiff's representations, Watson and Honkala agreed that Plaintiff would be eligible for 28.2% of Ligandal Tech.'s equity in compensation for performance of the duties and responsibilities of Ligandal Tech.'s Chief Operating Officer.

127.     Plaintiff also fraudulently induced Watson and Honkala to accept the formation of their proposed company as a LLC, rather than the C-corporation that they requested.

128.     After Plaintiff fraudulently induced Watson and Honkala to hire him, it became abundantly clear that Plaintiff was completely unqualified to perform the legal and business development services that he assured Watson and Honkala we would be able to do.

129.     Over a roughly 6-month period, Plaintiff's misrepresentations and incompetence damaged the Defendants on multiple occasions.  Plaintiff either outright refused to provide and / or was unable to provide any of the services that he represented he could provide. Plaintiff's legal and business incompetence is evidenced by (1) his inability to prepare basic corporate formation documents and other legal and business development documents; (2) his preparation of poorly written documents weeks after they were requested and needed; (3) his failure to include basic, yet important contractual provisions that a layperson would have included, and (4) his inability to provide documents that were not riddled with typos and /or other errors.

130.     Due to Defendants' reliance on Plaintiff's misrepresentations about his legal and business expertise, several potential investors walked away, the intended formation of a corporation in Delaware was delayed by 6 months, and outside counsel had to be retained to re-do the few documents that Plaintiff actually bothered to prepare.  Plaintiff's inactions and incompetence also required the Ligandal Tech. Officers to devote a large amount of their time on damage control.

131.     As a direct result of Plaintiff's fraudulent representations, on which the Defendants relied, the Defendants were damaged by losing at least 1 year of income and at least $500,000 in capital investments.


## SECOND COUNTERCLAIM
### (Breach of Contract)

132.     Defendants repeat and reallege Paragraphs 72 through 131 of the Counterclaims as if each of those paragraphs was set fully and at length herein.

133.     On August 7, 2013, Plaintiff, Urey, Watson, and Honkala executed the Aug. 7th Agreement.  Pursuant to that the Aug. 7th Agreement, Plaintiff agreed to provide specific services, including "[e]nsuring the productive progression of the day-to-day operations," "interfacing between all technical developments, legal, and financial issues," [d]irecting customer development and outreach," and "[s]eeking out and forming fruitful partnerships with related companies."

134.     After executing the Aug. 7th Agreement, Plaintiff refused and / or failed to perform his duties and responsibilities, thereby breaching the terms of that Agreement.

135.     In early September 2013, Plaintiff, Urey, Watson, and Honkala modified the Aug. 7th Agreement by reducing the amount of equity for which would be eligible and by reducing Plaintiff's duties and responsibilities.

136.     After executing the September 2013 amendment to the Aug. 7th Agreement, Plaintiff refused and / or failed to perform his new duties and responsibilities, thereby breaching the terms of that Agreement.

137.     As a result of Plaintiff's breach(es) of contract, the Defendants were damaged by losing at least 1 year of income and at least $500,000 in capital investments.

### THIRD COUNTERCLAIM
**(Breach of Fiduciary Duty)**

138.     Defendants repeat and reallege Paragraphs 72 through 137 of the Counterclaims as if each of those paragraphs was set fully and at length herein.

139.     Through his employment at Ligandal Tech., Plaintiff had access to Ligandal Tech.'s (now Ligandal's) confidential documents, including its business plans and technology.

140.     As an officer of Ligandal Tech., Plaintiff owed it and the Ligandal Tech. Officers a fiduciary duty to not disclose Ligandal Tech.'s (now Ligandal's) confidential information to third parties and /or not use it in a manner inconsistent with the best interests of Ligandal Tech or the Ligandal Tech. Officers.

141.     As a direct result of Plaintiff's intentional actions, Ligandal Tech.'s (now Ligandal's) and / or the Ligandal Tech. Officers' relationships with existing and potential investors, licensors, and / or employees have been disrupted.  Upon information and belief, existing and potential investors are now confused as to who is the owner / licensee of the technology on which the Ligandal Tech. Officers have based their business; further, potential licensors are confused as to whom to license. Plaintiff's actions have caused significant delays in the Ligandal Tech. Officers' receipt of licenses, capital investments, and revenue.  In addition, the Ligandal Tech. Officers have had to increase the amount paid to prospective employees.  Further,

Plaintiff's actions have caused Ligandal Tech.'s (now Ligandal's) confidential information to be shown to third parties. Moreover, by using Ligandal Tech.'s (now Ligandal's) confidential information and representing that it was his, Plaintiff has caused damage to Defendants' goodwill and reputations.

**FOURTH COUNTERCLAIM**
**(Tortious Interference)**

142. Defendants repeat and reallege Paragraphs 72 through 141 of the Counterclaims as if each of those paragraphs was set fully and at length herein.

143. Upon information and belief, Plaintiff began to intentionally, improperly, and maliciously interfere with the Ligandal Tech. Officers' existing and prospective contractual relations. Plaintiff has interfered with existing and prospective investors, prospective licensors, and / or prospective employees of Ligandal, Inc., a company owned by the Ligandal Tech. Officers.

144. Upon information and belief, Plaintiff has intentionally and maliciously induced third-party investors to not discuss and / or continue discussing making capital investments in Ligandal, Inc., a company owned by the Ligandal Tech. Officers.

145. Upon information and belief, Plaintiff has also intentionally and maliciously induced third-party licensors to not enter into and / or continue discussing licensing agreements with Ligandal, Inc., a company owned by the Ligandal Tech. Officers.

146. Upon information and belief, Plaintiff has also intentionally and maliciously induced third-party graduate students to not enter into and / or

continue discussing employment agreements with Ligandal, Inc., a company owned by the Ligandal Tech. Officers.

147.    At all relevant times, Plaintiff desired to interfere with the Defendants' existing or prospective contractual relations.  At all relevant times, Plaintiff was aware that his actions were improper and would certainly result in interfering with existing or prospective contractual relations of Ligandal, Inc., a company owned by the Ligandal Tech. Officers.

148.    Through his access of Ligandal Tech.'s (now Ligandal's) confidential documents and through his confidential discussions with the Ligandal Tech. Officers, Plaintiff was aware that the Ligandal Tech. Officers had existing and prospective business relationships with the third-party investors, licensors, and graduate students that he contacted.  Plaintiff was also aware that the existing and prospective relationships that the Ligandal Tech. Officers had with those third parties would have resulted in an economic benefit to the Ligandal Tech. Officers.

149.    Upon information and belief, Plaintiff fraudulently misrepresented that he owned Ligandal Tech.'s (now Ligandal's) confidential business model, confidential business information, and confidential technology.  Further, Plaintiff – a former officer of Ligandal Tech. – violated his fiduciary duty by using Ligandal Tech.'s (now Ligandal's) confidential information.

150.    As a direct result of Plaintiff's intentional actions, Ligandal Tech.'s (now Ligandal's) and / or the Ligandal Tech. Officers' relationships with existing and potential investors, licensors, and / or employees have been disrupted.  Upon information and belief, existing and potential investors are now confused as to who

is the owner / licensee of the technology on which the Ligandal Tech. Officers have based their business; further, potential licensors are confused as to whom to license. Plaintiff's actions have caused significant delays in the Ligandal Tech. Officers' receipt of licenses, capital investments, and revenue.  In addition, the Ligandal Tech. Officers have had to increase the amount paid to prospective employees.  Further, Plaintiff's actions have caused Ligandal Tech.'s and the Ligandal Tech. Officers' confidential information to be shown to third parties.  Moreover, by using Ligandal Tech.'s (now Ligandal's) confidential information and representing that it was his, Plaintiff has caused damage to Defendants' goodwill and reputations.

### FIFTH COUNTERCLAIM
### (Misappropriation of Trade Secrets)

151.    Defendants repeat and reallege Paragraphs 72 through 150 of the Counterclaims as if each of those paragraphs was set fully and at length herein.

152.    The business and technology documents from that Plaintiff made copies of and used after his removal contained Ligandal Tech.'s (now Ligandal's) confidential information.  Plaintiff was aware that the documents were confidential and were the property of Ligandal Tech. (now the property of Ligandal).

153.    The confidential information of Ligandal Tech.'s (now Ligandal's) included information related to its proprietary business plan / model, as well as its proprietary technology.  These documents provide Ligandal Tech.'s (now Ligandal's) with a competitive advantage over competitors.

154.     Until Plaintiff's actions, Ligandal Tech.'s (now Ligandal's) confidential documents had been kept in private files and / or databases, and had not been made available to the public.

155.     Plaintiff acquired Ligandal Tech.'s (now Ligandal's) confidential documentation without authorization or consent, and in violation to Plaintiff's fiduciary duty to Ligandal Tech.

**SIXTH COUNTERCLAIM**
**(Unfair Competition)**

156.     Defendants repeat and reallege Paragraphs 72 through 155 of the Counterclaims as if each of those paragraphs was set fully and at length herein.

157.     Ligandal Tech. (now Ligandal) possessed several "trade secrets," including a proprietary business plan, proprietary customer and investor lists, and proprietary technology.  These documents provided Ligandal Tech. (now Ligandal) with a competitive advantage.

158.     As a former officer of Ligandal Tech., Plaintiff acquired the confidential documentation without authorization and in violation of his fiduciary duty.

159.     Plaintiff used those documents for his own benefit and has caused Ligandal Tech.'s (now Ligandal's) technology to be shown to unauthorized third parties.

**RELIEF REQUESTED**

Based on the foregoing, Defendants Ligandal Tech., Watson, and Honkala respectfully request the Court:

(A)     Deny, with prejudice, all of Plaintiff's Claims (I-V);

(B)     Grant the Defendants' First Counterclaim, awarding the Defendants compensatory damages of an amount to be determined at trial, but in no event less than $500,000, and punitive damages of an amount to be determined at trial, but in no event less than $1,000,000;

(C)     Grant the Defendants' Second Counterclaim, awarding the Defendants compensatory damages of an amount to be determined at trial, but in no event less than $500,000, and punitive damages of an amount to be determined at trial, but in no event less than $1,000,000;

(D)     Grant the Defendants' Third Counterclaim, awarding the Defendants compensatory damages of an amount to be determined at trial, but in no event less than $500,000, and punitive damages of an amount to be determined at trial, but in no event less than $1,000,000;

(E)     Grant the Defendants' Fourth Counterclaim, awarding the Defendants compensatory damages of an amount to be determined at trial, but in no event less than $3,000,000, and punitive damages of an amount to be determined at trial, but in no event less than $1,000,000, and Order Plaintiff to stop interfering with Watson, Honkala, and / or Ligandal Tech.'s (now Ligandal's) business relationships;

(F)     Grant the Defendants' Fifth Counterclaim, awarding the Defendants compensatory damages of an amount to be determined at trial, but in no event less than $3,000,000, and punitive damages of an amount to be determined at trial, but in no event less than $1,000,000, and Order

Plaintiff to stop violating the Defendant's rights and to take all steps possible to preserve the Defendants' confidential information;

(G)   Grant the Defendants' Sixth Counterclaim, awarding the Defendants compensatory damages of an amount to be determined at trial, but in no event less than $3,000,000, and punitive damages of an amount to be determined at trial, but in no event less than $1,000,000, and Order Plaintiff to stop violating the Defendant's rights and to take all steps possible to preserve the Defendants' confidential information;

(H)   Award the Defendants attorneys' fees, applicable interest, and reasonable costs; and

(I)   Award the Defendants such other and further relief as the Court deems just and proper.


Dated: August 11, 2014
New York, NY

**Law Offices of Anthony Pastor, P.C.**

  /s/ Anthony Pastor

Anthony Pastor, Esq.
1221 Ave. of the Americas
Suite 4200
New York, NY 10020
212.964.3333


*Attorney for Defendants*
*Andre Watson, Alexander Honkala,*
*and Ligandal Technology, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of August, 2014, a true and correct copy of **DEFENDANTS LIGANDAL TECHNOLOGY, LLC, ANDRE WATSON, AND ALEXANDER HONKALA'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** was filed and served via Electronic Case Filing (ECF) on all counsel of record who have consented to electronic service and is available for viewing and downloading from the ECF system.

_____ /s/ Anthony Pastor___

Anthony Pastor